THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MILTON A. CULLY, JR., Defendant-Appellant.

Second District    No. 2—95—1381

Opinion filed January 17, 1997.

Gail A. Moreland, of Franks & Gerkin, of Wonder Lake, for appellant.

Gary W. Pack, State's Attorney, of Woodstock (William L. Browers and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DOYLE delivered the opinion of the court:

Following a jury trial, defendant, Milton A. Cully, Jr., was convicted of practicing medicine without a license in violation of section 50 of the Medical Practice Act of 1987 (Act) (225 ILCS 60/50 (West 1994)). Defendant appeals, contending that (1) it was unconstitutional for the State to use an underlying statute that allows the nonrenewal of a medical license when the licensee has defaulted on an educational loan (20 ILCS 2105/60(5) (West 1994)) in conjunction with section 50 of the Act; (2) the trial court erred when it refused to instruct the jury that knowledge was an element of the offense; and (3) prosecutorial misconduct denied defendant a fair trial.

Defendant was self-employed as a licensed chiropractic physician in Algonquin, Illinois, from July 31, 1989, through July 31, 1993. On April 5, 1993, the Illinois Department of Professional Regulation (Department) sent defendant two documents.

One of the documents was entitled "*NOTICE OF ORDER OF REFUSAL TO RENEW*" (Nonrenewal Notice). The Nonrenewal Notice provided, in relevant part:

> "PLEASE TAKE NOTICE that pursuant to Illinois Revised Statues [*sic*] (1991), Chapter 127, Paragraph 60(5) [(now 20 ILCS 2105/60(5) (West 1994))] the Director of the Department of Professional Regulation signed the attached ORDER which provides that the Department shall refuse to renew your license because your Illinois Education Loan is in default.
>
> The Department's Order also provides that renewal shall be denied until a satisfactory repayment schedule has been established with the Illinois Student Assistance Commission (ISAC) and approved by the Department. Please contact the ISAC to determine the terms of a repayment schedule.
> ***
> You are hereby advised that you are to cease practice as of July 31, 1993. PRACTICE BEYOND THAT DATE MAY SUBJECT YOU TO CRIMINAL PROSECUTION AND DEPARTMENT PROSECUTION FOR UNLICENSED PRACTICE.
>
> YOU ARE FURTHER NOTIFIED that you have a right to judicial review of all final administrative decisions of this Department, pursuant to the provisions of the 'ADMINISTRATIVE REVIEW ACT', (Illinois Revised Statutes (1991), Chapter 110, Paragraph 3—101 et. seq.)."

158

The second document was entitled *"ORDER OF REFUSAL TO RENEW"* (Nonrenewal Order). The Nonrenewal Order stated that the Department was ordering the nonrenewal of defendant's license to practice as a chiropractic physician effective July 31, 1993. The Nonrenewal Order also stated that the Department would continue to refuse to renew defendant's license until a satisfactory repayment schedule was established with the ISAC and approved by the Department.

Defendant's license expired on July 31, 1993, and the Department has not renewed it. Nonetheless, defendant continued to practice chiropractic medicine until March 31, 1995, when he was arrested for practicing medicine without a license.

At trial, defendant testified that, in response to the Nonrenewal Notice and the Nonrenewal Order, he met with an ISAC representative for the purpose of stopping the nonrenewal of his license. The balance of defendant's educational loan at that time was $12,025.56. Defendant acknowledged that his monthly payments on the loan were $160, but he had not made any payments. In April 1993, defendant paid the ISAC a total of $800 on the loan. Accrued interest resulted in a loan balance of $11,304.21 following defendant's April 1993 payments. Defendant testified that after the April 1993 payments, he may have made additional payments to the ISAC, but admitted that if he did, "there weren't many of them." Defendant testified that he just did not have enough money to make additional payments on the loan.

Defendant further testified that after going to ISAC and making the payments in April 1993 he thought his license was "in good status." Defendant admitted that he understood that his license was due to expire as of July 31, 1993, but testified that he thought his license would remain in good status after that date because he "was still in dialog" with the ISAC. The trial court did not allow defendant to elaborate as to the details of this dialog, but did allow defendant to testify that he was in regular contact with the ISAC, had brought his financial records to the ISAC representatives, and had contact with the ISAC regarding his license as recently as October 1994.

On cross-examination, defendant acknowledged that his license to practice chiropractic medicine in Illinois expired on July 31, 1993. Defendant also acknowledged that the license that expired July 31, 1993, was the second license he had received from the Department and that prior to its expiration he had displayed the license in his office by framing it and hanging it on a wall.

On cross-examination, defendant also testified as follows:

"Q. Mr. Cully, you knew the Department of Professional Regula-

tions did not renew your license, and in fact, that it was expired on July 31, 1993; is that right?

A. Yes.

Q. You never got anything in the mail and never got a new license; is that right?

A. That's correct.

Q. You never filled out an application and sent in the fee; did you?

A. That's correct."

The jury found defendant guilty of practicing medicine without a license. The offense is a Class 4 felony for the first violation and a Class 3 felony for subsequent violations. 225 ILCS 60/59 (West 1994). The trial court sentenced defendant to 24 months of conditional discharge, fined him $500, ordered him to pay $1,000 in costs for public defender services, and ordered him to perform 200 hours of public service work. Defendant's appeal followed the denial of his motion for a new trial.

On appeal, defendant first raises the issue of whether the State's application of section 50 of the Act to defendant was unconstitutional. Section 50 (225 ILCS 60/50 (West 1994)) describes the offense of practicing medicine without a license. Section 60(5) of the Civil Administrative Code of Illinois (the Code) (20 ILCS 2105/60(5) (West 1994)) is also relevant. Section 60(5) of the Code allows the Department to deny the renewal of a medical license to any person who has defaulted on an educational loan guaranteed by the ISAC. Defendant contends that the Department's use of section 60(5) of the Code in conjunction with section 50 of the Act was both a violation of equal protection and an unlawful exercise of the State's police power in violation of defendant's due process rights to pursue the practice of chiropractic medicine under the Illinois and United States Constitutions.

■ The right to pursue a profession is not a fundamental right for due process purposes. *Potts v. Illinois Department of Registration & Education*, 128 Ill. 2d 322, 330 (1989). Thus, the appropriate standard of review is the rational basis test. *Bernier v. Burris*, 113 Ill. 2d 219, 228-29 (1986), citing *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 488, 99 L. Ed. 563, 572, 75 S. Ct. 461, 464 (1955).

Under the rational basis test, a court will uphold a statute if the statute bears a rational relationship to a legitimate legislative purpose and is neither arbitrary nor discriminatory. *Harris v. Manor Healthcare Corp.*, 111 Ill. 2d 350, 368 (1986). Because a statute is presumed to be valid, a party challenging a statute has a substantial burden in attempting to establish that the statute is unconstitu-

tional, and the party challenging the statute has the burden of proving that it is irrational. *Potts*, 128 Ill. 2d at 332.

■ The parties agree that the principles set out in *People v. Lindner*, 127 Ill. 2d 174 (1989), should guide courts in applying the rational basis test. These principles require a court to (1) identify the public interest that the statute in question is intended to protect; (2) examine whether the statute bears a reasonable relationship to the public interest; and (3) determine whether the method used to protect or further the interest is reasonable. *Lindner*, 127 Ill. 2d at 180.

However, the parties do not agree on the rule governing the determination of whether the statute bears a rational relationship to the public interest. The State contends that the court may hypothesize reasons for the legislation, even if such reasons did not motivate the legislature in enacting the statute. In the State's view, the court should uphold the statute if there is any conceivable basis for finding a rational relationship. Defendant counters that *Lindner* rejected the State's argument and held that the scope of review under the rational basis test is limited to a consideration of whether the statute bears a rational relationship to its stated purpose.

In applying his view to this case, defendant asserts that the purpose of the Act is to protect the public health. Defendant argues that section 60(5), the statute allowing the nonrenewal of a medical license when a license holder defaults on an education loan, does not bear a rational relationship to the interest of protecting the public health. Defendant also argues that the method used by section 60(5) is not a reasonable method to further the interest of protecting the public health. Based on this analysis, defendant concludes that the State's use of section 60(5) in conjunction with section 50 of the Act did not satisfy the rational basis test and was therefore unconstitutional.

The State first responds that the question presented by defendant is not properly before this court. The State reminds us that defendant is appealing from a conviction of practicing medicine without a license and that the trial court that convicted him was not the tribunal that decided that defendant's license was not renewable. The State observes that the nonrenewal of defendant's license was the result of an administrative action. The State argues that defendant should have resolved the nonrenewal of his license through administrative proceedings before continuing his practice rather than taking it upon himself to defy the Department's action and practice without a license. We agree.

■ Section 41 of the Act (225 ILCS 60/41 (West 1994)) specifically provides for judicial review of all final administrative decisions pur-

suant to the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 1994)). When, as in this case, the act empowering an agency expressly adopts the Administrative Review Law, then the procedure set out in the Administrative Review Law exclusively governs judicial review of the final administrative decision. 735 ILCS 5/3—102 (West 1994).

In this case, defendant seeks review of the final administrative decision to deny the renewal of his license. However, the appropriate means for defendant to obtain judicial review of the nonrenewal of his license was to file a complaint concerning that matter within 35 days of the decision. See 735 ILCS 5/3—103 (West 1994). Defendant did not do that. Thus, that decision is not properly before us. The only question properly before us is whether defendant practiced medicine without a valid license.

Defendant contends on appeal that seeking review of the Department's decision pursuant to the Administrative Review Law would have been futile. Defendant argues that the circuit court would not have stayed the criminal trial pending judicial review of the administrative decision. However, defendant does not explain why judicial review of the decision, which was effective July 31, 1993, could not have been accomplished before the criminal proceedings began following defendant's arrest on March 31, 1995.

It is readily apparent that defendant chose not to seek judicial review of the Department's decision by way of the procedures set out in the Administrative Review Law, but instead opted to flaunt the nonrenewal of his license and practice without it in defiance of section 50 of the Act. For these reasons, the issue is not properly before this court.

Even if, *arguendo*, defendant's constitutional argument were properly before us, the argument would fail. Defendant has interpreted *Lindner* too narrowly. Defendant contends that *Lindner* stands for the proposition that in applying the rational basis test a court is limited to determining whether there is a rational relationship between the statute in question and the stated purpose of the statute.

A careful reading of *Lindner* shows that the court in that case did not limit itself to the stated purpose of the statute in question there. In determining the public interest of the statute in question in *Lindner*, the court stated that "the legislature's intent is to be determined from the statute in its entirety, including the subject it addresses." *Lindner*, 127 Ill. 2d at 182. The court also stated that "we consider not only the statement of purpose" set out in the statute. *Lindner*, 127 Ill. 2d at 181.

The *Lindner* court next addressed the State's argument that the

court must consider "any conceivable basis for the challenged provision." *Lindner*, 127 Ill. 2d at 183. Although the court stated that it was not persuaded by that argument, the court nonetheless considered the bases which the State offered and determined that, notwithstanding these bases, the statutes in question failed to pass the reasonable basis test and were therefore unconstitutional. *Lindner*, 127 Ill. 2d at 184-85.

In this case defendant contends that the only public interest which we should consider in determining whether section 50 of the Act and section 60(5) of the Code have a rational relationship to the purpose of the Act is the protection of public health. Defendant asserts that this is the stated purpose of the Act. However, defendant does not cite the Act as authority for this view, and in our review of the Act we were not able to locate such a stated purpose.

We do not dispute that public health is one of the public interests that the Act is intended to protect. However, reading the Act in its entirety leads us to conclude that defendant's position is unduly narrow. Our supreme court stated the interests to be protected by the Act in a way which more fully reflects the Act read in its entirety when it noted that "the State has a legitimate interest in regulating medical professionals in order to protect the public welfare" (*Potts*, 128 Ill. 2d at 330).

Stating the public interest to be protected by the Act in this way encompasses sections of the Act that are not necessarily directly related to medical competency, but that are nonetheless proper parts of the Act. For example, section 9(B)(1) of the Act requires that applicants for a license be of good moral character. 225 ILCS 60/9(B)(1) (West 1994). In addition, section 22 of the Act lists a number of grounds that allow the Department to revoke or suspend a license. 225 ILCS 60/22 (West 1994). Many of these grounds are not directly related to medical competency. These grounds include conviction of a felony and engaging in dishonorable, unethical, or unprofessional conduct likely to deceive, defraud, or harm the public. 225 ILCS 60/22(A)(3), (A)(5) (West 1994).

With this more expansive public interest in mind, we conclude that section 50 of the Act and section 60(5) of the Code bear a reasonable relationship to the purpose of the Act. It is reasonable for the State to not renew a medical license when the licensee culpably defaults on an educational loan and the loan has enabled the licensee to pay for the education that is a prerequisite for the license. If the licensee culpably does not repay the loan, this calls his moral character into question and could constitute conduct that defrauds or harms the public.

We also conclude that the method used to protect the interest is reasonable. Not renewing the license of a licensee who defaults on an educational loan serves as an incentive to repay the loan. The threat of nonrenewal is a deterrent to nonpayment.

For these reasons, we hold that the State's use of section 60(5) of the Code in conjunction with section 50 of the Medical Practice Act does not violate the due process clauses of the Illinois and United States Constitutions. Therefore, the State's use of these statutes in this case was not unconstitutional on due process grounds.

Defendant next contends that the State's use of section 60(5) of the Code in conjunction with section 50 of the Act violated his constitutional equal protection rights. Defendant asserts that the objective of the Act is only to protect public health. Defendant argues that classifying him as a doctor who has not repaid an educational loan and using that classification to decide to not renew his license is not reasonably related to public health and is therefore unconstitutional on equal protection grounds.

■ In equal protection analysis, where the classification in question does not affect a fundamental right or discriminate against a suspect class, the standard for judging the constitutionality of the classification is the reasonable basis test. *Miller v. Department of Professional Regulation*, 276 Ill. App. 3d 133, 144 (1995), citing *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 49 L. Ed. 2d 511, 517, 96 S. Ct. 2513, 2516 (1976); *Cutinello v. Whitley*, 161 Ill. 2d 409, 417 (1994). As seen above, the right to pursue a profession is not a fundamental right; thus, courts reviewing statutes that regulate professions apply the rational basis test. *Potts*, 128 Ill. 2d at 330. Accordingly, we will apply the rational basis test in this case.

■ Our supreme court recently set out the principles guiding courts in applying the rational basis test in the context of an equal protection claim. The court stated:

> "Whether a rational basis exists for a classification presents a question of law, which we consider *de novo*. *Cutinello v. Whitley*, 161 Ill. 2d 409, 417 (1994). Under the rational basis test, a court's review of a legislative classification is limited and generally deferential. *People v. Shephard*, 152 Ill. 2d 489, 502 (1992). The court simply inquires whether the method or means implied in the statute to achieve the stated goal or purpose of the legislation is rationally related to that goal. *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54, 74 (1990). The legislation carries a strong presumption of constitutionality (*People v. Blackorby*, 146 Ill. 2d 307, 318 (1992)), and if any set of facts can reasonably be conceived to justify the classification, it must be upheld (*Shephard*, 152 Ill.

2d at 502)." *Jacobson v. Department of Public Aid*, 171 Ill. 2d 314, 323-24 (1996).

■ Under these principles, defendant's equal protection claim fails. As established above in the due process analysis, the means employed in using section 60(5) of the Code in conjunction with section 50 of the Act were rationally related to the goal of the Act. Consequently, the State's use of these statutes did not violate defendant's equal protection rights.

■ Defendant next contends that the trial court erred when it refused to instruct the jury that knowledge was an element of the offense of practicing medicine without a license. Over defendant's objection, the trial court gave the jury the State's instructions, which did not include knowledge or any other mental state as an element of the offense. In doing so, the trial court refused to give the jury defendant's instruction, which included knowledge as an element of the offense.

In its ruling, the trial court noted that section 50 of the Act (225 ILCS 60/50 (West 1994)), which defines the offense, does not contain any language regarding knowledge as an element of the offense. The trial court then concluded that the legislature therefore intended to make the offense an absolute liability offense.

Section 50 provides:

"Any person who practices medicine in all of its branches or treats human ailments without the use of drugs or operative surgery including, but not limited to, treatment or diagnosis of any physical or mental ailments or conditions including, but not limited to, deformities, diseases, disorders, or injuries without a valid license under the laws of this State shall be sentenced as provided in Section 59." 225 ILCS 60/50 (West 1994).

Section 59 of the Act makes the first violation of section 50 a Class 4 felony and subsequent violations Class 3 felonies. 225 ILCS 60/59 (West 1994).

Defendant contends that the trial court erred when it concluded that the offense was an absolute liability offense. We agree.

Section 4—9 of the Criminal Code of 1961 (Code) (720 ILCS 5/4—9 (West 1994)) governs absolute liability offenses. Section 4—9 provides:

"Absolute Liability. A person may be guilty of an offense without having, as to each element thereof, one of the mental states described in Sections 4—4 through 4—7 [including knowledge] if the offense is a misdemeanor which is not punishable by incarceration or by a fine exceeding $500, or the statute defining the offense clearly indicates a legislative purpose to impose absolute liability for the conduct described." 720 ILCS 5/4—9 (West 1994).

As our supreme court has noted, the committee comments to section 4—9 reveal that the legislature intended to limit the scope of absolute liability. *People v. Gean*, 143 Ill. 2d 281, 285 (1991). The committee comments provide, in relevant part:

"This section is intended to establish, as an expression of general legislative intent, rather strict limitations upon the interpretation that mental state is not an element of an offense, although the express language of the provision defining the offense fails to describe such an element. \*\*\*

\* \* \*

In addition to permitting a construction requiring absolute liability in offenses punishable by incarceration or by a fine of not more than $500, the second part of section 4—9 expresses the policy that in other offenses not including a mental state in the definition only a clearly indicated legislative intent to create absolute liability should be recognized, and in all other instances, a mental-state requirement should be implied as an application of the general rule that an offense consists of an act accompanied by a culpable mental state \*\*\*." 720 ILCS Ann. 5/4—9, Committee Comments—1961, at 169-72 (Smith-Hurd 1993).

It is evident from the language of section 4—9 and from the committee comments that, contrary to the view expressed by the trial court, the mere absence of expressed statutory language describing a mental state does not lead *per se* to the conclusion that no mental state is required. *Gean*, 143 Ill. 2d at 286. Rather, in accordance with section 4—9, where an offense is a felony, courts will imply a mental state element in the offense unless a clear legislative intent to impose absolute liability is evident. 720 ILCS 5/4—9 (West 1994); see *People v. Farmer*, 165 Ill. 2d 194, 203 (1995).

Based on these principles, because the offense of practicing medicine without a license is a felony, we will imply a mental state element in the offense unless a clear legislative intent to impose an absolute liability is evident. There is nothing in the language of section 50 to suggest a legislative intent to make the offense an absolute liability offense. In addition, our review of the legislative history of section 50 reveals nothing to suggest that the legislature intended to make the practice of medicine without a license an absolute liability offense. Accordingly, we will imply a mental state element in the offense.

Having concluded that the offense of practicing medicine without a license is not an absolute liability offense, we must determine which mental state element applies to the offense. Under section 4—3(b) of the Code, when a statute defining an offense which is not an absolute liability offense does not prescribe a particular mental state, then ei-

ther intent, knowledge, or recklessness is applicable. 720 ILCS 5/4—3(b) (West 1994). In this case, we agree with defendant that knowledge is the appropriate mental state element of the offense. Thus, the State had to prove that defendant practiced medicine with the knowledge that he did not have a valid license.

Anticipating this result, the State contends that, even if there was a mental state element for the offense, the trial court was not required to instruct the jury as to the mental state element. The State argues that, where the mental state element for an offense is implied, an instruction as to the mental state is not required.

It is not always error to omit an implied mental state from jury instructions. *People v. Garland*, 254 Ill. App. 3d 827, 832 (1993). However, where the implied mental state is specific enough, a jury instruction as to the mental state is required. *People v. Adams*, 265 Ill. App. 3d 181, 187 (1994). We conclude that the implied mental state of knowledge with respect to the offense of practicing medicine without a license is specific enough to require an instruction. Accordingly, the trial court erred when it refused to give the jury defendant's instruction which included knowledge as a mental state element of the offense.

The State next contends that any error in improperly instructing the jury was harmless. The State argues that defendant's guilt was so clear and convincing that the jury could not reasonably have found defendant not guilty.

Error in giving or refusing instructions does not always require reversal. *People v. Jones*, 81 Ill. 2d 1, 9 (1979). Reversal is not required when the evidence of a defendant's guilt is so clear and convincing that it would be unreasonable for the jury to find the defendant not guilty. *Jones*, 81 Ill. 2d at 9.

In this case, the instructional error was the omission of an instruction that knowledge is a mental state element of the offense. However, defendant's knowledge that he was practicing medicine without a valid license was blatantly evident from the circumstances. There is no doubt that defendant received the Nonrenewal Notice and Nonrenewal Order. These documents plainly advised defendant that his license would not be renewed and to cease practice as of July 31, 1993. The documents clearly notified defendant that continuing to practice after July 31, 1993, could subject him to criminal and departmental prosecution for unlicensed practice. The documents also advised defendant that the renewal of his license would continue to be denied until both a satisfactory repayment schedule was established with the ISAC and the Department's approval was given.

Defendant may have taken some steps to establish a repayment

schedule with the ISAC. However, the record is devoid of any evidence to suggest that defendant obtained the Department's approval for the plan.

Defendant admitted that he knew his license had expired, but he nonetheless continued to practice chiropractic medicine. After his license expired, defendant took the expired license off the wall in his office where it had been displayed. Defendant did not take any of the routine steps that he had taken in the past to renew his license, such as completing an application form for the renewal of the license and submitting the appropriate fee.

On this record, defendant's knowledge that he no longer had a valid license after July 31, 1993, was blatantly evident. Consequently, any error in failing to instruct the jury that knowledge was an element of the offense was harmless.

Defendant next contends that he is entitled to a new trial because of various instances of prosecutorial misconduct. Defendant asserts that the State's misconduct denied him a fair trial. The claimed misconduct by the State included: (1) references throughout the trial to defendant's lack of insurance, particularly malpractice insurance; (2) references to defendant's failure to pay taxes; (3) references to defendant's submitting insurance claims when he was not licensed; (4) deliberately misleading the jury during rebuttal closing argument by suggesting that defendant encouraged a presumed patient to pursue a fraudulent worker's compensation claim; and (5) inflaming the jury by referring to defendant as "Dr. Deadbeat" in rebuttal closing argument. Defendant argues that the State improperly sought to portray defendant as a bad person and that the portrayal created a bias against defendant that prevented him from receiving a fair trial.

The State responds by contending that defendant waived most of these claimed errors by failing to object to them. The State also asserts that any claimed errors that were not waived were either cured by the trial court or were harmless.

Our review of the record indicates that in all but two of the instances of claimed misconduct defendant did not object at trial. When a party fails to raise issues at the trial level through both an objection at trial and a post-trial motion, the issues are waived and the party may not raise the issues on appeal. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).

Defendant concedes that he did not object to many of the claimed errors. However, he contends that we should review the claimed errors under the plain error rule. The plain error rule permits a reviewing court to consider issues that have been waived by an accused where (1) the evidence is closely balanced, or (2) the error is so

fundamental and of such magnitude that it denies the accused a fair trial. *People v. Lucas*, 151 Ill. 2d 461, 482 (1992). In this case, the evidence was not closely balanced and the waived claimed errors, neither individually nor cumulatively, were not so fundamental or of such magnitude as to deny defendant a fair trial. Accordingly, we will not consider any of the claimed errors except the two claimed errors to which defendant objected.

The first claimed error that defendant objected to occurred during the State's rebuttal argument when a prosecutor stated that, because defendant did not have malpractice insurance, defendant's employees could have been found liable if there had been an injury to one of defendant's patients. Defendant's attorney objected by stating, "That is a point of law that has not been brought into issue." The trial court sustained the objection and instructed the jury to disregard the statement.

A defendant faces a substantial burden when seeking a reversal based on improper remarks made during closing argument. Even if a prosecutor's remarks exceed the bounds of proper comment, a reviewing court should not disturb the verdict unless it can be said that the remarks in question resulted in substantial prejudice to the accused, such that absent those remarks the verdict would have been different. *People v. Byron*, 164 Ill. 2d 279, 295 (1995).

■ Under these principles, the prosecutor's statement in this case that defendant's employees could have been liable because defendant did not have malpractice insurance did not constitute reversible error. The statement came after the jury had already heard an abundance of evidence regarding defendant's practice of medicine without a license. Under these circumstances, the statement was not substantially prejudicial.

In addition, the trial court sustained defendant's objection to the statement and clearly instructed the jury to disregard the statement. This cured any error that occurred. See *People v. Cobb*, 186 Ill. App. 3d 898, 916 (1989).

The other instance of claimed prosecutorial misconduct that defendant objected to also occurred during the State's rebuttal argument. Defendant contends that the prosecution made several references to defendant as "Dr. Deadbeat" during its argument and that these references were improper and prejudicial to defendant.

Our review of the record revealed two separate instances where the State referred to defendant as "Dr. Deadbeat" during its rebuttal argument. Defendant objected to one of the references, but the trial court allowed the reference to stand.

On appeal, the State maintains that defendant sought to portray

himself as an honest man who, due to bad luck, fell behind on his financial obligations through no fault of his own. The State contends that the references to defendant as "Dr. Deadbeat" were therefore fair comments to try to negate defendant's portrayal of himself.

The State is allowed substantial latitude in closing argument. *People v. Pecoraro*, 144 Ill. 2d 1, 16 (1991). It is improper, however, for counsel to resort to name-calling. See *People v. Johnson*, 119 Ill. 2d 119, 139-40 (1987). Although we recognize that, under certain circumstances, ridicule may be used legitimately as an argument technique, we do not approve of the prosecutor's "Dr. Deadbeat" comments because we view them as falling into the category of unnecessary name-calling. We believe that the trial court should have sustained defendant's objection to the comments.

However, even if the State's references to defendant as "Dr. Deadbeat" were improper, it cannot be said that the references resulted in such substantial prejudice to defendant that the verdict would have been different absent the references. The evidence that defendant knowingly practiced medicine without a license was overwhelming. Any verdict other than guilty in the face of this evidence would have been unreasonable.

Based on the foregoing, we affirm defendant's conviction of practicing medicine without a license.

Affirmed.

BOWMAN and RATHJE, JJ., concur.